the proceeds the banking firm be first paid, and that his wife have the balance then remaining. It was not shown that there was more than sufficient property to pay the honest debts of the grantors in the bill of sale, and the transaction was upheld. In Delaney v. Valentine, 154 N. Y. 692, 49 N. E. 65, a debtor executed a chattel mortgage to a creditor to secure her debt, and also the indebtedness of certain other specified creditors, and empowered her, in default of payment, to sell the mortgaged property, and out of the proceeds of the sale to pay the debts mentioned and interest, and the expenses of the sale, rendering the overplus, if any, to the mortgagor. On the same day he transferred to another person, being one of those named as a creditor in the chattel mortgage, certain accounts or choses in action as collateral security for the payment of a portion of the debts secured by the said chattel mortgage, and also to secure the debts of certain other named creditors. All of the debts mentioned were honest debts of the mortgagor, and the mortgagor was then insolvent. The chattel mortgage and transfer were upheld. It will be seen that these transfers are upheld either by reason of their being intended as collateral security, or, in cases where they were not intended as collateral security, a price was fixed for the goods sold, and a definite agreement made as to how the same should be paid. In this case we have an absolute transfer of property that the plaintiffs admit was worth much more than their claim. It was not made as a collateral security, but for their own benefit, and the benefit of the other creditors. No price was agreed upon for the property, and it was not made for the purpose of paying specified claims. It was a transfer of all the firm assets for the benefit of all the firm creditors, and it seems to us to be exactly such a transaction as the general assignment law was intended to reach and make impossible, except in the way pointed out by such statute. The judgment is affirmed, with costs. All concur.

---

(61 App. Div. 357.)

## In re DWIGHT.

(Supreme Court, Appellate Division, Third Department. May 8, 1901.)

1. ASSIGNMENT FOR BENEFIT OF CREDITORS—PURCHASE OF CLAIMS BY ASSIGNEE'S ATTORNEY—RIGHT TO PROFITS.

   Where an attorney for an assignee for the benefit of creditors purchases claims against the estate, he is only entitled, on final accounting, to recover the amount paid therefor, and cannot make a profit on the transaction, though the purchase is made with the consent of the assignee, and for the benefit of the estate in an attempted settlement.

2. SAME—JURISDICTION.

   Under General Assignment Law, § 25, providing that the court shall have full jurisdiction of all and every act relating to estate assigned for the benefit of creditors, and authorizing the exercise of the powers of a court of equity in reference to the trust, and any matter involved therein, the supreme court has jurisdiction of a final accounting of an assignee in which the right of an attorney of the assignee to profits on claims purchased by him is in issue.

3. SAME—COMPENSATION OF ATTORNEY—WAIVER.

   Where the attorney of an assignee for the benefit of creditors, who has purchased claims against the estate, seeks on final accounting to re-

cover an increased price therefor, and not compensation for effecting their purchase for the benefit of the estate, it is a waiver of the latter claim, and he is entitled to no allowance therefor.

Appeal from Chemung county court.

Final accounting of John W. Dwight, as assignee for the benefit of creditors of the firm of Fitch & Aldrich. From a decree settling the accounts, the assignee and another appeal. Affirmed.

Argued before PARKER, P. J., and KELLOGG, EDWARDS, SMITH, and CHASE, JJ.

Harry S. Thayer, for appellant John W. Dwight.

Judson A. Gibson, in pro. per.

Frederick Collin, for appellees Chemung Canal Bank and another.

CHASE, J. On the 6th day of April, 1897, Albert B. Fitch and Charles D. Aldrich individually and as co-partners under the firm name of Fitch & Aldrich, manufacturers of sash, doors, and blinds, made a general assignment for the benefit of creditors to John W. Dwight. Judson A. Gibson was the attorney for the assignee. From the inventories filed as required by law it appears that the firm had liabilities amounting to $210,027.39, nominal assets amounting to $226,985.21, and actual assets amounting to $158,391.70. The assignors did not have title to the land on which their plant stood, but they had possession thereof under a contract to purchase the same. The assignee was under a large expense in the care of the property; and the title to the property, as well as the claims upon the same, was such that expensive and long-continued litigation was probable, or at least possible. The assignee as well as the assignors were desirous of reorganizing and continuing the business. The Chemung Canal Bank of Elmira was a creditor to the extent of $146,071.40, while the total amount of all the other firm liabilities, as stated in the inventory, was about $64,000. The bank demanded 50 cents on a dollar in settlement of its claim. Mr. Reynolds was one of the firm of attorneys who usually represented the Chemung Canal Bank in its legal matters. The assignee consulted with Mr. Reynolds in regard to the matter of settling up the assigned estate, and Mr. Reynolds suggested that the claims be bought in. Mr. Gibson, the attorney for the assignee, was sent for, and came to the office of the assignee, and the matter was discussed, and Mr. Reynolds suggested that Mr. Gibson should purchase the claims. Mr. Gibson and the assignee went to Buffalo with Mr. Aldrich, one of the assignors, to see the creditors. In the meantime the Chemung Canal Bank brought an action to restrain the assignee from selling the property held under the contract as stated, including buildings and machinery and other property permanently placed thereon, and asked to have the court adjudge that the bank had a lien on the property of the assignors to the extent of $55,000, and that the property be sold for the purpose of paying its said lien. The creditors of the assignors other than the bank were substantially all represented at a meeting of creditors in Buffalo at which the assignee and his attorney, Mr. Gibson, and Mr. Aldrich, one of the assignors,

were present; and the creditors there represented sent one Carey to Elmira, to look over the books of the assignors, and he examined the books and the question of the litigation with the assignee. After his return, and after one Smith, representing another creditor, had been sent to Elmira, the creditors so represented agreed to accept 25 per cent. of their claims in settlement. The assignee said to the creditors that he believed that the bank would receive more than 25 per cent. of its claim, but that it would have to take its pay in property, and would have to carry the new concern that was to be organized, and wait a good many years for its pay. The record shows that all the talk had by the assignee and by Gibson in regard to the payment of 25 per cent. related to a settlement of the claims of these several creditors. The 25 per cent. was paid in nearly every instance by Mr. Gibson personally, and an absolute assignment of the claims was taken by Mr. Gibson in each case. The assignee took an active part in purchasing these several claims, and letters were written by him to many of the creditors, all in the same form except the names and amounts were changed to correspond with the facts in each particular case. The principal part of the letters so written by the assignee to the creditors is as follows:

"Owing to the distressed business conditions which have existed, it has taken some time to reach a point where it seemed possible that a settlement could be effected. There is at the present time suit brought against me by the Chemung Canal Bank, of this city, claiming about $70,000, in equity, against this property. With a claim as large as this, and involving as many questions as it does, it does not seem as though a speedy adjustment could be reached, and a final dividend paid by the assignee to the creditors. Some of the friends of the late firm are compromising these matters, and have made an offer of 25 cents on the dollar if accepted immediately. I will state to you that most of the creditors are accepting this; in fact, all of them as fast as the case is presented. If this adjustment is not made, it looks as though it would be several years before a settlement can be reached. Will you kindly advise me if you care to accept this offer, and, if so, I will have the proper papers sent you for your execution. This is done with a view of reorganization, and the plant assuming operations again. All of the leading lumbermen and supply dealers have accepted this offer."

E. A. Smith & Co., creditors of the assignors, wrote a letter accepting the offer. The correspondence of the assignee on the subject of a compromise seems to have been in the possession of Mr. Gibson, and the letter of E. A. Smith & Co., accepting the offer, was answered by Mr. Gibson at some length, and at the end of the letter he says:

"Please execute, attach an acknowledgment to the assignment in accordance with the laws of your state, entitling it to be filed in this state, as all of these claims will be filed in our court upon the discharge of the assignee, and I am taking these assignments in my name for the purpose of executing a final consent to his discharge when they are all in and paid."

To another creditor, who had received the formal letter from the assignee, Mr. Gibson wrote:

"Yours to Mr. John W. Dwight, assignee, has been handed to me for answer. The majority of the creditors have accepted the offer, and in fact we have had no reply refusing the offer. As Mr. Dwight no doubt fully wrote you the situation, it will not be necessary for me to say anything fur-

ther except that, after a thorough investigation, the creditors who hold claims to $10,000 and $12,000 each have readily assented, and forwarded to me the assignments of their claims, and have been paid."

The claims so assigned to Mr. Gibson amounted to $51,633.19, and the only claims presented to the assignee other than the claim of the Chemung Canal Bank and the claims so assigned to Gibson were six in number, amounting to the sum of $810.30. It appears from the record that the assignee not only corresponded with the creditors, and urged them to compromise their claims by accepting 25 per cent., but that he personally made the arrangement for the settlement with the creditors in most instances, and then turned the matter over to Gibson, his attorney, and the matter was then consummated by an absolute assignment of the claims as stated. Thirteen witnesses were sworn in this proceeding, representing more than two-thirds of the claims that were so assigned to Gibson, and they each testified to their agreement to settle and compromise their claims, respectively, on payment of 25 per cent. None of these creditors so appearing as witnesses made any further claim against the assigned estate, or in any way expressed a desire to be made a party to the proceeding. An examination of the testimony received in this proceeding, including the correspondence and the other exhibits, leads irresistibly to the conclusion that these several claims assigned to Gibson were purchased in the interest of the assigned estate, and the findings of fact made by the county court are fully justified by the evidence. Mr. Dwight and Mr. Gibson used their knowledge of the trust estate and their position and relations to the trust estate in aid of securing such claims, and in inducing the owners thereof to dispose of the same to Mr. Gibson. For some reason the business was not reorganized and continued as had been proposed, and after some further delay, and after these claims were so assigned to Gibson, there was a meeting, at which the assignee, Mr. Gibson, and Mr. Reynolds were present, and there was talk about settling the remaining claims, and save the estate the expenses of an accounting. The question of the assignee's commissions and Gibson's compensation was also discussed. Mr. Gibson wanted 10 per cent. on the amount of the claims assigned to him. He finally offered to accept $4,000, and waive any further claim for an allowance from the estate. They were unable to come to an agreement, and it was left for a judicial settlement of the assigned estate. This proceeding was instituted, and the court refused to allow the assignee for any payments to Mr. Gibson on the assigned claims other than the amounts paid out by him, with interest. To allow a trustee and his attorney to take advantage of their trust relation and their special knowledge by reason of such relation to make an individual profit out of the trust fund is contrary to public policy. This is so well stated in the case of Cloak & Suit Co. v. Dodge, 120 Ind. 1, 21 N. E. 344, 6 L. R. A. 369, that I quote from such case:

"We are clear that the attorney had no right to reap any profit from the purchases made by him with the trust funds. It was the duty of the court to require the assignee to account for the profits realized by his attorney. The

position occupied by the latter imposed upon him the obligation to devote his labor and his talents to the service of the creditors whom the assignee represented. He had no right, occupying the position he did, to engage in buying claims for his individual benefit; and, as the assignee knew of the conduct of his attorney, he violated his duty in allowing him to secure more than the actual cost of the claims. Whatever profit accrued from the use of the trust funds by the attorney belonged in equity to the persons entitled to the funds. * * * It would be subversive of justice to permit an attorney of a trustee to use his position for his individual benefit, although he made no use of the trust funds; and we are satisfied that, even where an attorney purchases the claims of creditors with his own money, he can obtain at most no more than the sum he actually paid for them. The policy of the law is to prevent an attorney from sacrificing the interests of his client for his own gain, and to carry into effect this policy the courts will not allow an attorney to take advantage of his position to the possible injury of his client. The assignee of an insolvent debtor owes a duty to all of the creditors. He certainly cannot be allowed to buy claims from creditors, and reap a profit. The reason for this rule operates against the assignee's attorney, for he, as the trusted confidential adviser of the trustee, represents all the beneficiaries. To him the assignee, as the representative of all the creditors, must look for advice; and that advice must come from an unbiased mind. He has no right to deal with them, or any of them, for his own benefit; for the instant he becomes interested he ceases to occupy the position which it is his duty to his client to maintain. To permit the attorney to buy claims, even with his own money, would open the way to fraud and wrong; and such ways it is the duty of the courts to tightly and securely close. The law means to keep attorneys from assuming positions where they may be tempted to prefer their own interests to those of their clients. To deter them from assuming such positions, it sternly denies them the right to secure any profit from their transactions with their clients, and requires them to yield it to the trust it was their duty to serve with undivided zeal and interest. In cases of this character it is unnecessary to prove a corrupt design or fraudulent practices. The intention may be honest, and yet the act be wrongful in legal contemplation. The wrong emerges from the improper departure from duty, and is complete without an evil or fraudulent purpose."

The court had jurisdiction of this matter. Section 25 of the general assignment law (Laws 1877, c. 466) is as follows:

"Any proceeding under this act shall be deemed for all purposes including review by appeal or otherwise, to be a proceeding had in the court as a court of general jurisdiction, and the court shall have full jurisdiction to do all and every act relating to the assigned estate, the assignees, assignors and creditors, and jurisdiction shall be presumed in support of the orders and decrees therein unless the contrary be shown, and after the filing or recording of an assignment under this act, the court may exercise the powers of a court of equity in reference to the trust and any matters involved therein."

Any. equitable lien that Mr. Gibson may have had on the claims assigned to him for his services in procuring the same was waived by not making a claim for such services on the accounting. At the close of his testimony as a witness in this proceeding he was asked by the court: "Q. As I understand from your evidence, the only claim that you have in this proceeding is as a creditor in the estate in the amount of claims assigned to you;" to which he replied, "That is all." The county judge, in his memorandum decision, says:

"On the argument Mr. Gibson did not claim any right to such compensation, and rested his claim to a portion of the assigned estate solely as owner of certain debts owing by the assignors at the time of the assignment. Although,

in his brief, he argues for such allowance, none has been allowed to him by the assignee, and no claim has been made for such."

The Chemung Canal Bank is not estopped from insisting that Mr. Gibson should not be paid on these claims anything more than the amount he paid for the same, with interest thereon. Although prior to the judicial settlement Mr. Gibson offered to accept a percentage on the claims assigned to him, and waive all claim for services to the assignee, such offer was not accepted by the bank; and, after the proceeding was commenced, the bank, in its objections to the account of the assignee, expressly stated its position, and clearly and consistently maintained its position throughout the entire proceeding. The result of the decree is to leave Mr. Gibson without compensation for services to which he was honestly entitled, but the decree was so made by reason of the persistent refusal of Mr. Gibson to present his claim in a proper manner to the assignee, and have the same passed upon in the final accounting.

Decree affirmed, with costs. All concur, except SMITH, J., not voting.